# 22-1409 CV

---

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

---

### JENNY RAMGOOLIE,

**Plaintiff-Appellant,**

**vs.**

### ANDY RAMGOOLIE,

**Defendant-Appellee,**

---

**On Appeal from the United States District Court**

**for the Southern District of New York**

---

**BRIEF FOR APPELLANT JENNY RAMGOOLIE**

Jenny Ramgoolie, Pro Se

9402 Calwood Cir Spring TX 77379

646-377-6792 - jramgoolie@gmail.com

1

# <u>TABLE OF CONTENTS</u>

Disclosure Statement  …………………………………………………..4

Statement of Jurisdiction……………………………………………...5

Statement of Issues……………………………………………………5

Statement of Facts……………………………………………………5

Standard of Review……………………………………………..… 8

Summary of Argument………………………………………………9

Argument………………………………………………..………...9

Conclusion……………………………………..………………29

Statement of Compliance……………………………………………31

Certificate of Service…………………………………………………..32

Page(s)

Cases

07 Civ. 10407 (LBS),
   2010 WL 4983179 (S.D.N.Y. Dec. 6, 2010) ....................................................... 18
24/7 Records, Inc. v. Sony Music Entm't, Inc.,
   566 F. Supp. 2d 305 (S.D.N.Y. 2008).................................................................. 18
*Abraham v. Leigh,*
   *471 F. Supp. 3d 540* ............................................................................................ 18
*Aluminum Fair, Inc. v. Abdella,*
   *90 A.D.2d 603, 456 N.Y.S.2d 184 (3d Dep't 1982)*…………………………….23,24
*Bausch & Lomb, Inc. v. Bressler*,
   977 F.2d 720 (2d Cir. 1992)................................................................................. 18

*Beitner v Becker*,
   34 AD3d 406, 824 N.Y.S.2d 155 ...................................................................... 27

Carco Grp. v. Maconachy,
   718 F.3d 72 (2d Cir. 2013)................................................................................ 8

*Daubert*,
   509 U.S.................................................................................................... 11,12

*Friedland v. Myers*,
   *139 N.Y. 432, 34 N.E. 1055 (1893)* ...................................................... 19

*Frymire-Brinati v. KPMG Peat Marwick*,
   2 F.3d 183 (7th Cir.1993)................................................................................ 13

*Helmick v. Probst*,
   *170 Misc. 284* ................................................................................................ 27

*In re TMI Litigation*,
   193 F.3d11 …………………………………………………………………11

*International Union of Operating Engineers, Local 150 v. Centor Contractors, Inc.*,
   *831 F.2d 1309 (7th Cir. 1987)* ...................................................................... 14

*Kannankeril v. Terminix Int'l, Inc.*,
   128 F.3d 802 (3d Cir. 1997)………………………………………………11

*Lend Lease [US] Constr. LMB Inc. v Zurich Am. Ins. Co.*,
   28 NY3d 675, 49 N.Y.S.3d 65, 71 N.E.3d 556 .................................................. 27

*Medical College Laboratory v. New York University*,
   *178 N.Y. 153* ................................................................................................ 27

*Mid-Hudson*,
   *418 F.3d* ................................................................................................ 23, 24

Thus, in the case of *Nature's Plus Nordic A/S v. N,
   ural Organics, Inc* .......................................................................................... 17

*O'Keeffe v. Bry*,
   456 F. Supp. 822 (S.D.N.Y. 1978)................................................................... 25

*Paoli*,
   35F.3d………………………………………………………………...10

*Reed v. McCord*,
   160 N.Y. 330 (1899) ...................................................................................... 29

*Robinson v. Munn*,
   *238 N.Y. 143 N.E. 784* ............................................................................... 25

*Ruiz-Troche v. Pepsi Cola Bottling Co.*,
   161 F.3d 77 (1st Cir. 1998) ........................................................................... 11

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*,
   *768 F. Supp. 89 (S.D.N.Y.1991)*................................................................... 23

*St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.,*
   *121 A.D.3d 1226, 994 N.Y.S.2d 704 (3d Dep't 2014)* ......................................... 19
*Toobian v Golzad,*
   *193 A.D.3d 778* ........................................................................................ 27
*U.S. East Telecomms., Inc. v. US West Communications Servs., Inc*.,
   38 F.3d 1289 (2d Cir. 1994)......................................................................... 24, 25
In the case United States,
   . Mitchell ........................................................................................... 11,12
United States v. U.S. Gypsum Co.,
   333 U.S. 364, 68 S. Ct. 525, 92 L. Ed. 746 (1948)................................................ 8
*V.S. Int'l, S.A. v. Boyden World Corp.*,
   862 F. Supp. 1188 (S.D.N.Y. 1994)................................................................. 18
*Vioni v. Providence Inv. Mgmt., L.L.C.,*
   *648 Fed. Appx. 114* .................................................................................. 23
*Ward v. Ward*,
   350 Wis. 2d 505 (2013)............................................................................... 12

Statutes

28 U.S.C. § 1291 ......................................................................................... 5
28 U.S.C. § 1332 ......................................................................................... 5

Rules

*Fed. R. Civ. P. 8(d)(2)*................................................................................. 20
Federal Rule of Evidence 702....................................................................... 10
Rule 26.1 of the Federal Rules of Appellate Procedure ......................................... 4

Other Authorities

*Alto Lending, LLC v. Altobridge Ltd.,*
   *2018 U.S. Dist. LEXIS 9937, *19*................................................................ 23
Restatement (Second) of Contracts § 344(b) (1981) ........................................... 18
*Shlasinger v. Yarrington,*
   *2018 U.S. Dist. LEXIS 137914, *27*.............................................................. 18

# **DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-

Appellant, hereby certifies that she has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## STATEMENT OF JURISDICTION

The district court have subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because of diversity of parties and the amount in controversy exceeds $75,000. The district court entered Order on June 13, 2022. Appellant filed a notice of appeal on June 30, 2022. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal is from a final judgment.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in not awarding the full measure of damages in the breach of contract.

## STATEMENT OF FACTS

Plaintiff-Appellant Jenny Ramgoolie, proceeding pro se, filed a complaint in the district court against numerous defendants in May, 2016 for breach of contract, quantum meruit, unjust enrichment, constructive trust, constructive fraud, breach of fiduciary duty, fraudulent conveyance, and intentional infliction of emotional distress due to actions that allegedly edged her out of her role in a dialysis center,

AANDCO Health Care Ltd. ("AANDCO"), located in Trinidad. See Compl., Dkt. 1.1 After several years of litigation, on September 10, 2019, the Court entered a default judgment against Defendant Andy Ramgoolie, the only remaining defendant in this case and Plaintiff's brother, as a discovery sanction and ordered him to pay Plaintiff's attorney's fees and costs associated with Plaintiff's motion for sanctions and a related motion to compel. See Dkt. 216 at 1. The Court then amended the Order of Reference to refer to Magistrate Judge Sarah Netburn two pending motions, the determination of attorney's fees and costs owed to Plaintiff, and an inquest on damages. On November 24, 2021, Judge Netburn issued a Report and Recommendation ("R&R") recommending that Plaintiff be awarded $398,380 Trinidad and Tobago Dollars ("TTD") plus pre-judgment interest. R&R, Dkt. 307 at 1. After an extension of the deadlines, both parties timely filed objections, see Dkts. 313–14,3 and responded to the other party's objections, see Dkts. 318, 321. The District Court finds no clear error in Judge Netburn's analysis or conclusions on any of these remaining items except she noted as follows: *While the Court does not find clear error in Judge Netburn's opinion, the analysis in this section merits further explanation. In New York, breach of contract damages are measured from the date of the breach by the value of the item in question — a rule that applies to non-delivery of shares of stock. See, e.g., Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 262 (2d Cir. 2002); Schonfeld v. Hilliard, 218 F.3d 164, 172, 175–76 (2d Cir. 2000); Simon v. Electrospace Corp., 28 N.Y.2d 136, 145 (1971). As a result, assuming arguendo that KDR is AANDCO's alter ego and Plaintiff is entitled to the value of 50 percent of KDR's shares, Plaintiff still needs to prove*

6

*the monetary value of those shares. Judge Netburn acknowledged that Plaintiff believes KDR was created to prevent her from receiving the money owed to her related to AANDCO and acknowledged Plaintiff's argument that, as a matter of fact, she is entitled to 50 percent of the shares of AANDCO (and by extension, KDR). R&R at 8, 13. As noted above, Judge Netburn found that, due to the limited documentation Plaintiff provided related to the companies' value, Plaintiff could not recover damages on this theory. Id. at 13. Put differently, Plaintiff is not legally entitled to damages in the form of being awarded ownership of 50 percent of the outstanding shares of KDR. Lucente, 310 F.3d at 262. She might be entitled to a damages award equal to the value of 50 percent of the shares of KDR, but for that to have been an option, she would have to have provided evidence from which the Court could, with a reasonable certainty, value 50 percent of KDR's shares.* the Court adopts Judge Netburn's R&R in full. Plaintiff is awarded $398,380 TTD plus pre-judgment interest at a 9 percent yearly rate accruing from January 15, 2016 until the date of entry of this judgment.

Appellant was recently provided with a crucial piece of document recently. On November 29th 2022, Attorneys for Jenny Ramgoolie, Mr. Pope in Trinidad received from Andy Ramgoolie attorneys in Trinidad, Mr. Jagroo a joint venture agreement, that was ordered to be disclosed by Trinidad appeal Judges Mr. Boodoosingh and Mr. Rajkumar in a hearing that took place on November 15th 2022. This joint venture agreement was signed on 18th of December, 2017 by Andy Ramgoolie, Kevin Ramgoolie and Jeremy Ramgoolie which states Andy Ramgoolie is the owner of 85% of the companies KDR, Direct Med and Biotech and Kevin has 10% and Jeremy 5%. A copy will be attached to this brief. Exhibit

1 . This document provides proof that Andy Ramgoolie is part of KDR and that the sale of AANDCO was a sham and shares of KDR should be awarded accordingly to Jenny Ramgoolie of $ USD13,409,105.

## STANDARD OF REVIEW

Court "review[s] a district court's findings of fact for clear error, and its conclusions of law de novo." Carco Grp. v. Maconachy, 718 F.3d 72, 79 (2d Cir. 2013). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948).

## SUMMARY OF ARGUMENT

While the district court made a correct finding of breach of contract in favor of Plaintiff-Appellant, the valuation it reached for AANDCO is so low because it did not believe the expert valuation report submitted by Plaintiff-Appellant. The expert report shows that the valuation is USD26,818,210.00 and pursuant to the agreement of the parties of a 50-50 split, Plaintiff-Appellant and Defendant-Appellee would each own half of the venture, and profits and losses would be shared equally. As 50% owner of the company, Plaintiff is entitled to USD13,409,105.

# **ARGUMENT**

I. **The accountant's valuation report adopted a methodology which produced a reliable indicator of the fair market value of AANDCO, thus, proving damages with reasonable certainty**

Central to the contract reached by parties is that Plaintiff is entitled to half of AANDCO's fair market value. However, the recommending judge found that Plaintiff's has not submitted documentation for the Court to assess the valuation. Quoting the relevant portions of the Report which the Court adopted:

> Plaintiff again provides little to support any calculation; she submits AANDCO's 2017 annual return of a company for profit, which indicates that the company has 10,000 shares, valued at $1 per share. See ECF. NO. 271, Ex 11. The return also shows that AANDCO carried $150,000 in debt, which exceeds the value of the shares. Id. The Court is again left without any basis by which to calculate Plaintiff's damages regarding any shares she might be owed. Nevertheless, Plaintiff has provided one concrete figure with documentation: in an agreement dated January 15, 2016, AANDCO was purchased by KDR Medical Care Ltd. For $796,760 Trinidad and Tobago Dollars ("TTD"). See ECF No. 271, Ex. 19.

Plaintiff-Appellant respectfully begs to differ. Shanaz Sukhdeo is being employed as an expert witness to come up with the valuation of the company. As qualified accountant, he used Discounted Cash Flow (DCF), an accounting method and principle in valuing the company. The summary of his report is as follows:

> Based on the figures provided, I first calculated the attached unit economics, the profit for one unit sold, for each dialysis treatment provided,

9

invoiced at TT$950. The unit economics uses the market rate for medical supplies – the real price AANDCO HCL would have paid to other sellers, to show the real profit per unit.

The net profits roll forward for reinvesting such as expansion and for shareholders to take from the company as dividends – so these represent lost income or gains to you as well. The net profits computations are from 2016 to 2019. Past net profits attributable to all shareholders of the company are not adjusted downwards for the time value of money. Instead, interest is usually computed and payable because you lost use of these funds from then to know.

Then I estimate future earnings, at a growth rate of a very conservative 5% per year and discounted to present value at 10%. The lower growth rate of 5% also factors in increases in costs, instead of using a 10% growth rate and increasing costs annually. The decade calculated is from 2020 to 2029. A ten year projected revenue is standard when valuating companies that are expected to be around for longer than 10 years. These projections are attached. Exhibit 2.

Combined, these calculations give a company valuation of:

One hundred and Eighty Million, Four hundred and ninety-one thousand, Nine hundred and sixteen TTD = TTD$180,491,916.00
OR
Twenty-six million, Eight hundred and eighteen thousand, Two hundred and ten USD =
USD26,818,210.00

Federal Rule of Evidence 702 requires that a witness who claims to be an expert based on knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if she meets four criteria:

- The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence to determine a fact in the issue;

- The testimony is based on sufficient facts or data;

- The testimony is the product of reliable principles and methods; and

- The expert has reliably applied the principles and methods to the facts of the case.

In the case United States v. Mitchell, 365 F.3d 215, the Court ruled as follows:

> Judge Selya has put it well:
>
> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process--competing expert testimony and active crossexamination--rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.
>
> *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (citations omitted) (quoting *Daubert*, 509 U.S. at 590) (citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *Paoli II*, 35 F.3d at 744), *quoted in part in In re TMI Litigation*, 193 F.3d at 692. [**81] Good grounds for admission plainly exist here.

In *Hipple v. SCIX, LLC*, U.S. District Court, E.D. Pennsylvania (2014)], the plaintiff's expert completed a "Calculation of the Value of SCIX" to find a reasonably equivalent value for the "transfer of SCIX's assets as of October 13, 2010." The defendant argued that the plaintiff's expert's proposed testimony failed both the fitness and reliability restrictions set forth in *Daubert* because he completed

only a limited "calculation of value" rather than a more extensive "opinion of value." The court rejected the defendant's argument and concluded that the proposed testimony of the plaintiff's expert was admissible. It stated that "both a Calculation of Value and Opinion of Value are engagements approved of by the American Institute of Certified Public Accountants." The court relied on *United States v. Mitchell* [365 F.3d 215, 244 (3d Cir.2004)]: "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination— rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." The expert relied on a multiple of seller's discretionary income as grounds, and the valuation agreement was not restricted by the client. It is important to note that while the expert used only one approach to value, it was his own independent estimate of value. Many critics of calculated values question the independence of the expert when using an approach to value agreed to by the client. This does not impede or restrict the expert's independence if the valuation analyst is free from client-imposed scope limitations.

In *Ward v. Ward*, 350 Wis. 2d 505 (2013)] The appellate court ruled that "circuit courts are not required to accept any one method of valuation over another." The petitioner-respondent's expert testified that the calculation of value was the appropriate approach for a business of this type, and the circuit court was persuaded

that this methodology produced a reliable indicator of fair market value. The expert used the capitalization of earnings methods with no scope restrictions placed by the client. Applying the foregoing legal citations, Shanaz Sukhdeo is a known expert in the area of accountancy. He used relevant data and documents to support his valuation. He used reliable methods such as DCF in supporting her findings. "Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ("DCF") method. *See, e.g., Frymire-Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 186 (7th Cir.1993) (referring to DCF method as "the methodology that experts in valuation find essential"). Sukhdeo's valuation report satisfies the requirement under the Federal Rules for the submission of an expert testimony. The calculations are supported by relevant documents and data and arrived at using acceptable and reliable accounting principles and methods.

Further, the valuation was taken from actual data, some from discovery bank statements, prior historical data of income and expenses from AANDCO and checks paid by Trinidad and Tobago government to AANDCO and KDR via Freedom of Information Act of Trinidad and Tobago, when the defendant refused to provide all documentation for discovery. The data is taken from real numbers from years and estimated for future years. The well anchored valuation report should provide reasonable basis for the Court to award Plaintiff's breach of contract damages.

## II.    The Alleged Asset Purchase Agreement is a sham document thus it does not reflect the accurate valuation of the company

There is a sufficient indicium of continuity that KDR is nothing but AANDCO in disguise. There is no change of ownership because the same officials are behind KDR. KDR uses the same location, machinery and equipment, while producing the same product - dialysis center. It essentially employed same workforce. We have two employee witness statements that confirm that they reported to Andy Ramgoolie as the boss when he was with AANDCO and continued to report to him when they changed over to KDR.  KDR is the alter ego of Aandco, and that is a disguised continuance of the first company and the transfer of assets was a sham transaction which was designed to eliminate Plaintiff from the picture and thus completely dodge contractual obligation of Defendant. The alter ego doctrine focuses on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets. ( *International Union of Operating Engineers, Local 150 v. Centor Contractors, Inc., 831 F.2d 1309, 1312 (7th Cir. 1987)* Being a sham document, the Court should not give credence to the understated consideration amounting to $796,769 TTD. This is a minuscule amount and even considered a nominal consideration when compared to the real valuation of the business which is TTD$180,491,916.00 or USD26,818,210.00. The agreement between the parties is

to split ownership as 50-50 of the company. Plaintiff and Defendant would each own half of the venture, and profits and losses would be shared equally. As 50% owner of the company, Plaintiff is entitled to USD13,409,105.

## III. Plaintiff-Appellant is entitled to reliance Damages for pre-AANDCO Operation

The district court agreed with the Report and Recommendation of Judge Netburn which found that there is no documentary evidence to award the sum of $500,000.00 for the extensive research she conducted before and after the dialysis centered opened from 2010 to 2014. She, however, conceded that plaintiff provided a detailed list of tasks describing her work for AANDCO. For brevity, the following is reproduced as follows with the corresponding number of hours and costs incurred.

**RESEARCH AND PLANNING  2010-2012  (total hours (total costs)**

1. Identify the type and cost of the Machinery on or about July 2010. (__) (__)
2. Had an oral agreement with my brother to set up the Dialysis Center in Trinidad in July/August 2010 (____)(____)
3. Identify a need for Dialysis Business in Trinidad & Tobago on or about 5/9/2012. Pg 251,252,
4. Hired Merritt to do research on machinery, supplies and staffing on about 4/1/2012. Pg 117,118,351,
5. Sent a questionnaire to Trinidad on the possibility on opening a Dialysis Clinic and the governmental willingness to work with the private sector and the re-imbursement rates if any by the government.  Pg 91
6. Created a business plan to assess the if this business would be successful.
7. Reminded my brother of our oral agreement and to get started – Dec 2012.

**CONSTRUCTION – PURCHASE AND SET UP OF EQUIPMENT - 2013**

8. Visited Trinidad in Feb 2013 and met with Kevin and Mike on the space to assess how the clinic will be set up. - copy of passport -defense has a copy.
9. Drew the first layout of the center. In file

15

10. Provided an Architect in Trinidad for part of the project. Pg 4, 85
11. Negotiated with Gia Medical for the purchase of Dialysis Machinery on about 2/27/2013. Pg60, 122
12. Reviewed supplies and sourced supplies with Merritt- 4/17/13 and various dates – pg 190
13. Followed up with Andy and Merrit on the purchase of equipment and shipment of Container 1 and 2. On or about 6/5/2013 and other dates Pg 1,68
14. Followed with Merritt and Andy on the payment of the equipment, as Deryck was holding funds for Andy, he would submit the payment.
15. Sourced other supplies locally to ship container 3 to Trinidad, medical supplies, office supplies and cleaning supplies. On or about 7/7/13 and various dates Pg 57,238,71
16. Obtained and shipped crash cart for the clinic. Pg 81-
17. Reviewed the status and update on Construction progress pg 348
18.  Reviewed Summary and status of project on or about 2/18/13- pg 88
19. Set up an appointment for Andy and Merrit to visit a local Dialysis Clinic in Trinidad, St. Augustine Private Hospital and to meet their nephrologist DR. Poon King. Merrit and Andy met with the doctor and toured the clinic.


**LICENSURE – COMPLIANCE AND REGULATIONS - 2013**

20. Coordinated initial water testing with the Government agency WASA in Trinidad on the type of water in the local area of the Dialysis Clinic. Pg 194 – water report
21. Coordinated with local Health Inspector of Trinidad, Public Health in Couva to make a visit and make any recommendations to the center. 5/15/13 and other dates Pg 230, 305
22. Informed Merritt to have the local Fire Department to come in make an unofficial inspection, this will help identify and need for EXIT signs, fire extinguishers, EXIT plan etc and in preparation for the final Fire Inspection. 5/15/13 and other dates   Pg 230
23. Reviewed application for licensure – pg. 42
24. Reviewed copy of brochure and suggested changes and updates. Pg 49
25. Post – initial inspection by the Government, informed Kevin to put a plan in place, include Parking spots, a sign for Community service, letter from landlord and tried to assist with a building permit clearance for the building.
26. Received update on Chief Medical officer visit to the center pg 353
27. Reviewed Checklist for Government Audit with Merritt for Trinidad Government pg 209,210
28. Worked in setting up binders for the Policies and Procedures for the Dialysis Center. Pg 58

**HUMAN RESOURCES – PRE- HIRE – PREPARATION - 2013**

29. Reviewed and set up Job Descriptions – pg 15 of Red file #1
30. Met with MInah and Mike at the Hyatt in Trinidad on the same trip in Feb 2013 to discuss Minah working for the center and getting employees to work there as well. Minah told me that trainees came to her center and she will choose the best ones to work at our center.
31. Informed Merrit to look for Nephrologists and Dialysis nurses in Mexico, Columbia, Venezuela and India. Pg 59,77,202,275,344
32. Reviewed resumes that we received for the first batch of Employees. Pg
33. Put an ad in the newspapers for Employees. 9/13/13 Pg 133
34. Reviewed Dr. Boris resume and request requirements to be the nephrologist for the center, suggested to Andy, he will not work out, he wants too much money and we are a new start-up. 9/23/13 Pg 127
35. Negotiation with DR. Raj to be Medical Director – pg 188

36. Discussed with Dereck to formulate a doctor's contract to be the Medical Director of the Clinic. Pg 34

**PREPARING FOR START -UP  Jan – July 2014**

37. In April 2014 – wrote the Prime Minister a letter as the AANDCO was completed and waiting over 8 months and still no license to operate.
38. In May 2014 -in desperation and looking for an alternative to the investment by Andy, thought to put the center up for sale, Plaintiff put an advertisement in the Newspaper. Plaintiff was thinking of a price of TT\$10 million, but Andy sent her an email saying ask for \$15 million.

Gleaning from the foregoing, total hours EXCEEDED 320 HOURS and total cost a at \$250/hr equates \$80,000. For his part, Defendant neither confirms nor denies that Plaintiff carried out all of these tasks from 2010 to 2014, Defendant claims that Plaintiff was simply an "administrator and employee" of Aandco, not an owner of the business. Plaintiff is entitled to reliance damages to enable her to recover identifiable costs incurred in reliance on the breaching party's promise, where the breaching party could reasonably foresee that they would be incurred. Assuming the Court finds proof adduced falls short of the expectation damages, an alternative award is reliance damages.

Thus, in the case of *Nature's Plus Nordic A/S v. Natural Organics, Inc., 98 F. Supp. 3d 600, 605,* the Court awarded reliance damages where expectation damages cannot be proven with reasonably certainty, Said the Court:

"United States District Judge Shira A. Scheindlin recently delineated the two different forms of redress under New York law in breach of contract suits, namely, "expectation damages" and "reliance damages."

Expectation damages provide the injured party with the benefit she would have enjoyed had no breach occurred— i.e., they aim to fulfill the injured party's expectations from the contract.13 Reliance damages, by contrast, seek to restore the injured party to the position she was in before the contract was formed. They allow for recovery of "expenditures [the injured party] made in reliance on defendant's representations and that he otherwise would not have made." Under New York law, when expectation damages defy precise calculation, reliance damages are the appropriate remedy."

In the case of *Abraham v. Leigh, 471 F. Supp. 3d 540, 565*, the Court awarded Plaintiff for the costs incurred in the preparation stage. This is similar to the present case where Plaintiff expended time, effort and money from 2010 to 2014 for the pre-AANDCO operation. Quoting the Court in *Abraham*:

"Reliance damages ... are intended to 'place plaintiffs in the same position as they were prior to the execution of the contract[.]'" *Summit Props. Int'l, LLC v. LPGA*, No. 07 Civ. 10407 (LBS), 2010 U.S. Dist. LEXIS 128825, 2010 WL 4983179, at *5 (S.D.N.Y. Dec. 6, 2010) (quoting *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1198 (S.D.N.Y. 1994)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 344(b) (1981) (damages for "reliance interest" put promisee "in as good a position as he would he would have been in had the contract not been made"). Reliance damages allow a plaintiff to recover "his expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract." *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir. 1992).

"Reliance damages concern money spent by the plaintiff in preparation for or partial performance of the agreement, not investments made by third parties." 24/7 Records, Inc. v. Sony Music Entm't, Inc., 566 F. Supp. 2d 305, 319 (S.D.N.Y. 2008).

In the case of *Shlasinger v. Yarrington, 2018 U.S. Dist. LEXIS 137914, *27*, the Court found the award of reliance interest as an alternative to expectation interest:

New York law provides that, "as an alternative to expectation-based damages," under such circumstances, "a plaintiff may recover 'damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.'" Plaintiff, without a doubt, has spent considerable time, money and effort for several years preparatory for the full performance of the contract with Defendant. Apply Shlasinger, Plaintiff implores the Court to award to her full reliance interest.

Based on the detailed documents adduced, reliance damages are recoverable because they are not speculative in nature and Defendant knew about the efforts expended by Plaintiff and they are certainly within the contemplation of parties. More importantly, it is through these efforts that AANDO, when it started its operations in 2014, benefited from those efforts providing strong foundation for the company to succeed in its business. "[R]eliance damages are recoverable 'provided they are proximate in effect, and are not speculative or uncertain in character and were fairly within the contemplation of the parties when the [contract] was made, or might have been foreseen as a consequence of a breach of its covenants.'" *St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth., 121 A.D.3d 1226, 1227, 994 N.Y.S.2d 704, 706 (3d Dep't 2014)(quoting Friedland v. Myers, 139 N.Y. 432, 436, 34 N.E. 1055 (1893)).*

Assuming for the sake of argument that Plaintiff is unable to prove contract damages with reasonable certainty. Still, in several cases, the Court has awarded reliance damages in lieu of expectation damages. Thus in *Alto Lending, LLC v. Altobridge Ltd., 2018 U.S. Dist. LEXIS 9937, *19*, the Court ruled: 'As set out above, where damages stemming from a breach of contract are certain, but the calculation of the preferred method of damages — expectation damages — is not, a court may instead award reliance damages to place a plaintiff in the same position as it was "prior to the execution of the contract." *Summit Properties*, 2010 U.S. Dist. LEXIS 128825, 2010 WL 4983179, at *5 (internal citations and quotations omitted). Here, Plaintiff has provided sufficient support for most of its claimed reliance damages by submitting a Declaration, made under penalty of perjury, by a person with knowledge (Schupak), attesting to the fees customarily charged by Plaintiff for its services (*see* Schupak Decl. ¶ 8), and providing copies of at least some attorney invoices to support Plaintiff's claim that it incurred legal fees and expenses in connection with its work on the joint venture, before the venture's collapse (*see id.*, Exs. B-D).'

Thus, from the foregoing, Plaintiff-Appellant prays the award of $80,000 representing reliance interest.

## IV. *Plaintiff-Appellant is entitled to her full Salary as Director of Clinical Operations*

The agreement of the parties is for the company to pay Plaintiff monthly salary in the amount of $10,000.00. Defendant states a minimum of $40k per year for salary, thus 2014-2021 $280,000 should be awarded for lost wages. Thus far, neither the company nor the Defendant paid a dollar to Plaintiff. Even Defendant does not deny the fact that Plaintiff worked for the company. In her Report to the Motion for Summary Judgment, Judge Netburn observed as follows:

> 'Although Defendant neither confirms nor denies that Plaintiff carried out all of these tasks from 2010 to 2014, Defendant claims that Plaintiff was simply an "administrator and employee" of Aandco, not an owner of the business.'

Whatever denomination Defendant may have labeled Plaintiff, the fact remains that Plaintiff worked as employee for the company and in conformity with the agreement, she should be paid for the accumulated salaries over time. In terms of control and management, there is no question that Plaintiff who is a registered nurse with a Master's Degree of Science in Health Administration managed the technical aspects / medical area of the dialysis center. No one else in management is qualified to do this - not Defendant, not Kevin, not Jeremy. Among other things, Plaintiff was in charge of staffing, including the hiring of the doctors; sourced and negotiated the supply of dialysis machines, managed the maintenance of the equipment, dealt with the government in producing the licenses and permits, managed and reviewed the company's financials, managed logistical issues such as

water treatment and parking space for the center, coordinated with health and fire inspectors and etc. Plaintiff had full access to the and transactional authority with Aandco's online banking system at Republic Bank Limited. There are also numerous emails in which Plaintiff manages Kevin and Jeremy who are listed shareholders of the company. Plaintiff's role in the overall operations of the company is beyond cavil.

Plaintiff's salary from 2012 to 2015 is $103,000.00 annually. The proof of salary earned by Plaintiff in New York should substantiate the relief for salary in this present case. While the company is in Trinidad and Tobago, the quality of work and professionalism of Plaintiff exhibited in her work in New York is the same quality discharged in her work in Aandco. Plaintiff has brought so much experience, skills and credentials to put up the company and it is because of her expertise as a health care professional in New York that she was able to apply everything that she learned in New York to put up the business in Trinidad and Tobago. The level of contribution and wealth of experience and skills expended by Plaintiff are necessary to propel the business to where it is today - a thriving, highly successful, money-making company. ***Moreso that the government adopted and implemented forms created by Plaintiff for all Dialysis centers in Trinidad.***

*V.*     **In the alternative, Plaintiff is entitled to recovery based on quantum meruit for the expenses incurred pre-Aandco and for the salary earned during the Company's operation**

Plaintiff pleads, in the alternative, that she is entitled to damages based on the equitable doctrines of unjust enrichment and quantum meruit.

Under New York law, quantum meruit and unjust enrichment claims can be considered together as a "single quasi contract claim." *Mid-Hudson, 418 F.3d at 175.* This is because "quantum meruit and unjust enrichment are not separate causes of action;" rather, "unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract." *Seiden Assoc., Inc. v. ANC Holdings, Inc.., 768 F. Supp. 89, 96 (S.D.N.Y.1991)* rev'd on other grounds, 959 F.2d 425 (2d Cir. 1992). A claim for quasi contract may be pled in the alternative to a contractual claim. *See Fed. R. Civ. P. 8(d)(2).* In the case of *Vioni v. Providence Inv. Mgmt., L.L.C., 648 Fed. Appx. 114, 116*, the Court detailed as follows: "Under New York law, quantum meruit plaintiff must show (1) good faith performance of services, (2) defendant's acceptance of services, (3) "expectation of compensation therefor," and (4) reasonable value of services (internal quotation marks omitted)); *Aluminum Fair, Inc. v. Abdella, 90 A.D.2d 603, 603, 456 N.Y.S.2d*

*184, 185 (3d Dep't 1982)* (explaining that, to prevail on quantum meruit claim, circumstances must imply "understanding on the part of both parties that there was an obligation to pay")."

Here, Plaintiff is alternatively praying for the award of damages on the basis of quantum meruit to prevent unjust enrichment. As abundantly discussed above, Plaintiff performed services from 2010 to 2014 prior to the full operations of Aandco. She expended the amount of $80,000 and spent total number of hours 320. This is what plaintiff can prove at this time, more hours were expended. Not once did Defendant object to any performance of service by Plaintiff throughout those years. In fact, Defendant acknowledged the fact that Plaintiff performed her duties as administrator. Plaintiff expected compensation for the services rendered and she is asking for reasonable payment. Where Defendant objects to the terms of the agreement, the Court can turn to the theory of quantum meruit to justify award of damages. In *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175-176,* the Court said: ("[A] party is not precluded from proceeding on both breach of contract and quasi-contract theories where . . . the contract does not cover the dispute in issue."); *see also U.S. East Telecomms., Inc. v. US West Communications Servs., Inc*., 38 F.3d 1289, 1298 (2d Cir. 1994) ("Recovery in quasi-contract outside the existing contract may be had if a party has rendered

additional services upon extra-contractual representations by the other party."). On the other hand, a plaintiff's entitlement to recover in quantum meruit outside of a valid contract may depend on a showing that the "'additional services' are 'so distinct from the [contractual] duties . . . that it would be unreasonable for the [defendant] to assume that they were rendered without expectation of further pay.'" *Id.* (quoting *O'Keeffe v. Bry*, 456 F. Supp. 822, 831 (S.D.N.Y. 1978) (further citation omitted)). However, the coverage of the express contract here involves issues of fact, which cannot be resolved as the record stands. In particular, when Quantum meruit recovery is sought by a salaried employee for "services rendered which fall outside the scope of duties of (the expressly agreed to) employment," entitlement to recovery turns on the question whether the "additional services" are "so distinct from the duties of (the) employment that it would be unreasonable for the employer to assume that they were rendered without expectation of further pay.*" Robinson v. Munn, supra, 238 N.Y. at 43, 143 N.E. 784, 785.* The question of reasonable expectations is one of fact which remains for determination. The catena of cases cited stands for the proposition that the Court can award damages that, despite the existence of an agreement, the breaching party strongly objects the coverage of performance in an agreement and that non-breaching party performed services outside the scope of the agreement. Here, Defendant, although he acknowledges that Plaintiff performed her duties as

administrator refused to pay contending that the services were not part of the agreement and therefore non-compensable. This factual dispute is one of a question of reasonable expectation which the Court can investigate.

## V.    The sham consideration of the Asset Sale cannot be the basis of an award for damages

As abundantly discussed above, there is a sufficient indicium of continuity that KDR is nothing but AANDCO in disguise. There is no change of ownership because the same officials are behind KDR. The purpose of the execution of the Asset Sale Agreement is to permanently remove Plaintiff from AANDCO and KDR. The agreement is designed to skirt around the contractual obligations of Defendant to Plaintiff and make it appear that the new company KDR has nothing to do with Plaintiff or defendant and therefore barred from taking in the profits from KDR. The fraudulent purpose of the Asset Sale is demonstrated in the shockingly low consideration of the agreement.  The Asset Sale consideration is a measly $796,769 TTD, a nominal consideration compared to the real valuation of the business which is TTD$180,491,916.00 or USD26,818,210.00. The consideration was understated by hundred fold. The Asset Sale Agreement is one with an illusory consideration, thus, should be struck down. "[A]n

illusory contract—that is, '[a]n agreement in which one party gives

as consideration a promise that is so insubstantial as to impose no obligation'—is

'unenforceable'" (*Lend Lease [US] Constr. LMB Inc. v Zurich Am. Ins. Co.*, 28

NY3d 675, 684, 49 N.Y.S.3d 65, 71 N.E.3d 556, quoting Black's Law Dictionary

370 [9th ed 2009]; *see Beitner v Becker*, 34 AD3d 406, 407, 824 N.Y.S.2d 155).

*Toobian v Golzad, 193 A.D.3d 778, 783*


Where a contract has been executed to perpetrate fraud and it has a sham

consideration, Courts have thumbed down its validity. A valuable consideration,

however small or nominal, if given or stipulated for in good faith, is, in the absence

of fraud, sufficient to support an action on any parol contract; and this is equally true

as to contracts of guarantee as to other contracts. *Helmick v. Probst, 170 Misc. 284,

288*


In *Medical College Laboratory v. New York University, 178 N.Y. 153, 156*, the Court

did not give credence to the nominal consideration of the contract and ordered a

rehearing to show the real consideration of the contract. The Court said:

> Equity -- Admissibility of Evidence Showing Inducement for a Deed
> Expressing a Nominal Consideration -- Decree Directing Reconveyance
> Based upon Failure of Consideration. A deed executed by an incorporated
> medical college conveying property to a university with which the college
> had merely a nominal connection, reciting a consideration of one dollar and
> an agreement by the grantee to pay the grantor's debts, if any, expresses
> a nominal consideration only, where there are no debts, and the statute
> authorizing the conveyance provided that the rights of any creditors of the
> grantor should not be thereby impaired, and the resolutions of transfer and
> acceptance showed that the agreement to pay the debts formed no part of
> the consideration; in such a case the real consideration may be shown by
> parol. Evidence, therefore, of negotiations prior to the deed, to the effect
> that the inducing cause of the conveyance was an oral statement made by a

representative of the university having apparent, but not actual, authority, that if the college would turn over all its property to the university the medical committee of the council of the latter should have entire management and control of the college, which should succeed in the appointment of professors to the powers theretofore exercised by the medical faculty, and that the medical committee should always remain constituted of people acceptable to the medical faculty, supplemented by evidence that subsequent to the execution of the deed the university had placed itself in such a position that it could not carry out the agreement whereby it had acquired the property, will support a decree in equity directing its reconveyance.

From the foregoing, there is an abundant case law which stands for the proposition that the if the consideration of the contract is nominal and shockingly low compared to the real value of the contract, and the attendant circumstances are against a factual backdrop of fraud and malice, then the Court can set aside the stated consideration and consider other evidence to show the real consideration. With the sham consideration of the Asset Sale Agreement, the Court may not be able to use the stated consideration as a measure of damages.

**VI.     The 2014 email of Defendant demonstrates that the 2014 valuation of the company is at 15Million TTD**

In an email dated May 7, 2014 between Plaintiff and Defendant wherein Plaintiff is asking Defendant how much he is willing to sell the business to which Defendant replied that he can sell it at 15Million TTD.  Since 2014, the company has steadily grown in leaps and bounds bagging multi-million dollar contracts from the

government of Trinidad and Tobago. The exponential growth of the business proves the magnitude of valuation of KDR and directly runs afoul with the very low consideration of the Asset Sale Agreement. Statement made by a party to the litigation which is inconsistent with his or her testimony in court or at a deposition taken by the party in the litigation is admissible under New York's admission exception to the hearsay rule and it may be testified to by anyone who heard it. Guide to NY Evidence ["Guide"] Rule 8.03. As stated by the Court of Appeals in *Reed v. McCord*, 160 N.Y. 330, 341 (1899): "[A]dmissions by a party of any fact material to the issue are always competent evidence against him [or her], wherever, whenever, or to whomever made." See Exhibit 2 AANDCO & KDR Valuation.

The 2014 admission of the Defendant as shown in his email regarding the valuation of the company is a far cry from the stated consideration of the Asset Sale Agreement of 796,769 TTD and is certainly within the 2021 valuation of TTD$180,491,916.00 by the accountant considering that from 2014 to 2021, the business has enjoyed tremendous success thus boosting its valuation exponentially. As the content of the 2014 email originated from a party to this case, it should bind him as party admission. Thus, as of 2014, the valuation of the company is at 15Million TTD.


## CONCLUSION

The court needs to be aware that Andy Ramgoolie was able to dodge and hide from both courts in Trinidad and USA. Somewhere he must be accountable for his actions of deceit. For the foregoing reasons, award damages for out of pocket expenses of $US10,000. Preparation of Dialysis Center $US80,000. Salary from 2014- 2021 $280,000 and the Court should modify the award of damages from $398,380 TTD to USD13,409,105 representing the 50% interest in Aandco and KDR.

November 22, 2022

JENNY RAMGOOLIE /s/
Pro Se

## <u>STATEMENT OF COMPLIANCE</u>

I certify that this brief is, double spaced, has 10.5 or less characters per inch, and has

7544 words.

Date:  November 22, 2022                                    Jenny Ramgoolie Pro Se

**United States Court of Appeals for the Second Circuit**

CAPTION:

RAM GOOLIE  v.

RAMGOOLIE

**CERTIFICATE OF SERVICE**

Docket Number: 22-1409

I, Jenny Ramgoolie, hereby certify under penalty of perjury that on
(name)

12/6/22, I served a copy of Appeal Brief and
(date)

Appendix, Exhibit 1- JV Agreement Exbit 2-KDR Valuation
(list all documents)

by (select all applicable)*

___ United States Mail

___ Federal Express

___ Overnight Mail

___ Facsimile

✓ E-mail

___ Hand delivery

on the following parties (complete all information and add additional pages as necessary):

| Edward S Rudofsky | 5 Arrowwood Lane | Melville | NY | 11747 |
|---|---|---|---|---|
| Name | Address | City | State | Zip Code |

| | | | | |
|---|---|---|---|---|
| Name | Address | City | State | Zip Code |

| | | | | |
|---|---|---|---|---|
| Name | Address | City | State | Zip Code |

| | | | | |
|---|---|---|---|---|
| Name | Address | City | State | Zip Code |

12/6/22
Today's Date

Signature

*If different methods of service have been used on different parties, please indicate on a separate page, the type of service used for each respective party

SAMPLE FORMAT

Page 32

Rev. 1/27/2012